**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------X     **Docket No.:** 18-CV-11756 (GBD) (DCF)

GENEVA AIKEN,

                      Plaintiff,

           v.

MTA NEW YORK CITY TRANSIT, DONALD
HOUSTON, *In His Individual and Official
Capacities,* PHAKESHIA MURPHY, *In Her
Individual and Official Capacities,* ALFRED
CAMINERO, *In His Individual and Official
Capacities,*

                      Defendants.

----------------------------------------------------------X


## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE*


**PHILLIPS & ASSOCIATES,**
**Attorneys at Law, PLLC**
Gregory Calliste, Jr., Esq
Alexandria Jean Pierre, Esq.
*Attorneys for Plaintiff*
45 Broadway, Suite 430
New York, New York 10006
(212) 248-7431 (p)
gcalliste@tpglaws.com
ajean-pierre@tpglaws.com

## PRELIMINARY STATEMENT

In their motion *in Limine,* Defendants attempt to limit Plaintiff's ability to prove her claims. Defendants do so arguing that the evidence that Plaintiff intends to introduce should be excluded because same is prejudicial and/or not relevant to Plaintiff's existing causes of action. Indeed, the evidence being offered against Defendants, which they now try to withhold from the jury, is bad for Defendants, but not "prejudicial." Just because Defendants do not like to see evidence of their repeated failures to control and protect a known discriminatory hostile work environment against Plaintiff, does not make said evidence prejudicial as contemplated by FRE Rules 401 and 402. Simply put, just because evidence is adverse to Defendants, does not make the evidence prejudicial as a matter of law.

In their Motion *in Limine*, Defendants blindly list almost 60 documents that they claim should be precluded, <u>without explaining to the Court (at all) how any of the documents they list are applicable to their arguments or why same should be precluded</u>. Then, Defendants list 19 witnesses that they claim should be precluded from testifying at trial and offer only vague conclusory recitations that these witnesses should be precluded. In this regard, Defendants have not provided the Court with clear arguments as to why

Defendants' application should be denied for the reasons stated herein.

## STATEMENT OF FACTS

Following Defendants motion for summary judgment, the Court determined that the below claims remain at issue in this case:

1. Whether Plaintiff's demotion was discriminatory, under <u>Title VII</u> (against Corporate Defendant MTA/NYCTA);

2. Whether Plaintiff's demotion was discriminatory, under the <u>NYSHRL</u> (against Defendants MTA/NYCTA and Caminero as an aider and abettor or direct actor);

3. Whether Plaintiff's demotion was discriminatory/retaliatory, under the NY**C**HRL (against Defendants MTA/NYCTA and Caminero); and

4. Whether Plaintiff was subjected to a discriminatory or retaliatory hostile work environment under the NYCHRL due to her request for religious accommodation (against all Defendants).

### **AS FOR PLAINTIFF'S DISCRIMINATORY DEMOTION CLAIMS.**

In the Report and Recommendation (**hereinafter "R&R"**) in response to Defendants' motion for summary judgment, dated 9/2/2021, Magistrate Freeman made the below recommendations, which were later upheld by District Court Judge Daniels following Defendants' motion for reconsideration.

In its R&R, the Court determined stated:

In the discrimination context, where Plaintiff need only prove that discrimination was a "motivating factor" in the challenged determination and not its "but for" cause (see Discussion, supra, at Section I(B)(2)(a)), Plaintiff's testimony regarding Caminero's comment to her, coupled with the timing of when it was purportedly made, could, if credited, give rise to an inference that she was demoted by the MTA based, at least in part, on discrimination by Caminero. See, e.g., *Brenner v. City of New York Dep't of Educ.*, 132 F. Supp. 3d 407, 420 (E.D.N.Y. 2015) (citing *Henry v. Wyeth Pharm.*, 616 F.3d 134, 149 (2d Cir. 2010)) (noting that considerations relevant to determining whether an inference of discrimination can be made from a supervisor's remark include "when the remark was made in relation to the employment decision at issue" and "the context in which the remark was made (i.e., whether it was related to the decision-making process)"), aff'd, 659 F. App'x 52 (2d Cir. 2016)

(R&R, page 49)

The Court also concluded:

For the reasons discussed above, this Court concludes that, to the extent Plaintiff is claiming discrimination based on one or more adverse employment actions, she has only met her preliminary burden to make out a prima facie case with respect to the conduct of Caminero, in connection with her demotion.

(R&R, page 52)

The Court also concluded:

While this Court has noted, above, that Plaintiff has submitted no evidence capable of suggesting that her job performance, was, in fact, satisfactory, this Court nonetheless finds that she has produced evidence from which a fact-finder could conclude that – even if her demotion resulted, in large measure, from her poor evaluations – Defendants' assertion that this was the sole reason for that adverse employment action is a pretext for a decision that was unlawfully motivated, at least in part, by religious discrimination. See Smith, 440 F. Supp. 3d at 328 (holding that, on a discrimination claim, a plaintiff must only show that the prohibited factor was one of the "motivating factors" for the adverse action).

(R&R, pp. 53-54)

Accordingly, during trial, Defendants will undoubtably introduce evidence of Plaintiff's alleged poor performance to try to support their defense that Plaintiff's termination was based on same. Plaintiff, on the other hand, will have to utilize the same evidence of alleged poor performance to describe to the jury how she was mistreated, treated differently that her counterparts, and not properly trained to prove to the jury that, following comments made by Defendants Houston and Murphy regarding Plaintiff's religious accommodations, she was subjected to abuse in furtherance of their threats to make sure Plaintiff would be demoted. Without documents related to her (alleged) poor performance and an explanation from Plaintiff about the circumstances surrounding same, the jury would be confused because they will see poor performance evaluations without context of how those poor evaluation came to be from Plaintiff's experience and perspective. The jury would have limited context and would be compelled to believe that Plaintiff's performance was unsatisfactory, without evaluating whether they believe that plaintiff's evaluations and treatment were part of the effort to cause her demotion.

Accordingly, evidence related to plaintiff's performance evaluations is relevant and material to Plaintiff's claims.

## AS FOR PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIM UNDER THE NYCHRL

Plaintiff's claims for hostile work environment under the NYCHRL survived Defendants' motion for summary judgment. In this regard, the Court found:

> Here, Plaintiff has testified that Houston and Murphy – who held positions of authority within the MTA and over her – variously told her that she would have to use her sick time, if she were scheduled to work on Sundays (see Pl. Dep., at 62:19-21, 69:15-17, 111:20-25, 123:7-13), that there would be "consequences" if she continued to request Sundays off (see id., at 113:7-11, 140:4-18), that she would be written up if she failed to show up for work on a particular Sunday (see id., at 72:2-4), and that she was causing the MTA a "financial burden" by not working on Sundays (see id., at 105:17-22). She has further testified that Caminero – who apparently had the authority to determine whether Plaintiff should, or should not, remain in her job – ultimately asked her whether she would have worked on Sundays, had she known she was going to be demoted. (See id., at 117:18-21.) "Construing the evidence in its totality and in [Plaintiff's] favor," this Court concludes that a fact-finder "could reasonably find" that these comments, if made, "constituted more than petty slights or trivial inconveniences," and were made to discourage Plaintiff from observing her Sabbath, or, worse, to threaten her with the loss of job benefits or even her job, should she persist in seeking a religious accommodation,

and that they therefore "subjected [Plaintiff] to a different set of employment conditions than her [] colleagues [who did not request religious accommodations]." Mihalik, 715 F.3d at 114.

(R&R, pp 43-45)

Lastly, the Court also determined:

The only additional discrimination claim which this Court finds should survive summary judgment under the NYCHRL, even if not under Title VII or the NYSHR, is a claim based on the Individual Defendants' alleged "threats" to Plaintiff for seeking Sundays off. As discussed above, such comments could not stand as an independent "adverse employment action" under Title VII and the NYSHRL. Under the NYCHRL, however, a plaintiff need not demonstrate the existence of an "adverse employment action." Instead, similar to its requirements for a hostile work-environment claim, the NYCHRL merely requires a plaintiff claiming "discrimination" to show that she was "treated differently from others in a way that was more than trivial, insubstantial, or petty."

(R&R, pp. 57-58)

As such, in this Case, Plaintiff's burden to prove the hostile work environment that she experienced requires Plaintiff to testify about how she was treated following her requests for religious accommodations.

As the Court is aware, a hostile work environment claim requires the jury to analyze the "totality of the circumstances." In determining whether a workplace is objectively hostile, a court should look at the "totality of the circumstances." Little v. NBC, 210 F. Supp. 2d 330, 388 (S.D.N.Y. 2002). In particular, courts should examine "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 288. When evaluating the "quantity, frequency, and severity" of the incidents, the court must look at the incidents "cumulatively in order to obtain a realistic view of the work environment." Id. at 288 (quoting Schnapp v. Town of Avon, 118 F.3d 106, 111 (2d Cir. 1997)). The "test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of [her] employment altered for the worse." Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003). Plaintiff asserts that her performance evaluations and multiple complaints to management about her [mis]treatment are necessary for the jury to analyze the totality of the circumstances faced by Plaintiff.

As an initial matter, the evidence and testimony cited below were taken from Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment and Plaintiff's 56.1 Counter Statement of Facts.

### A. Plaintiff *Does Not Intend* to Pursue A Constructive Discharge Claim At Trial, *But Does Intend* To Advise The Jury That She Resigned & The Circumstances Surrounding Her Resignation Are Relevant

At Point I(A) of their Memorandum, Defendants assert that Plaintiff should be precluded from pursuing a claim for constructive discharge. As an initial matter, Plaintiff is aware that the Court dismissed Plaintiff's claims for constructive discharge and Plaintiff does not intend to argue that theory, or that she was terminated, during trial. Plaintiff did resign from her employment under circumstances that support her hostile work environment claims and those are facts that Defendants should not be allowed to filter.

A fact of the case is that Plaintiff resigned from employment after being repeatedly harassed by Defendant Caminero (without reasonable basis) following her demotion by Caminero. The facts in furtherance of Plaintiff's hostile work environment, and failure of the Employer Defendant MTA/NYCTA to act in response to Plaintiff's complaints about Defendants, as well as Defendant Caminero's continued harassment of Plaintiff after she was demoted are relevant for this trial. Further, the fact that Plaintiff resigned from her employment due to the continued harassment of Defendant Caminero is a fact that the Jury should know when analyzing potential liability and damages against Defendant Caminero and Defendant MTA/NYCTA. In this regard, Plaintiff's resignation is relevant.

Under the first element of a hostile environment claim, plaintiff "must establish that the harassing conduct was severe *or* pervasive — not severe *and* pervasive . . . . The standard is disjunctive." Dash v. Bd. of Educ., 238 F. Supp. 3d 375, 385-86 (E.D.N.Y. 2017), *citing*, Dillon v. Ned Mgmt., Inc., 85 F. Supp. 3d 639, 655 (E.D.N.Y. 2015). "A plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have

altered the conditions of her working environment." <u>Whidbee v. Garzarelli Food Specialties, Inc.</u>, 223 F.3d 62, 69 (2d Cir. 2000).

"The conduct must be both one that a 'reasonable person would find hostile or abusive [objective], **and one that the victim in fact did perceive to be [subjective]**'." <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787 (1998) [*emphasis added*]. "[T]here is neither a threshold magic number of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim." <u>Howley v. Town of Stratford,</u> 217 F.3d 141, 154 (2d Cir. 2000).

Following her demotion, Plaintiff's title of SLD was not immediately changed/removed from NYCTA's system for months after Plaintiff's demotion and Plaintiff still held the (official) title of SLD for months thereafter. (SJM Exh. BB, email from H Tomlinson to A Caminero, dated 5/1/2018). Though Plaintiff was demoted by Caminero to a bus operator in January 2018, Plaintiff still held the official title of SLD into May of 2018. (Id.). In addition to Defendant Caminero's statements and conduct, which the Court has already determined to be part of Plaintiff's hostile work environment clams leading up to Plaintiff's demotion, Plaintiff was further abused by Defendant Caminero **<u>after her demotion</u>** and was forced to go on medical leave as a result. While Plaintiff was out on medical leave, Plaintiff was ordered by the MTA/NYCTA to report to West Farm Depot's General's Office for medical observation. While Plaintiff was complying with directives, was appearing at the Depot for medical reasons, and had justifiable reasons to be present, Defendant Caminero approached Plaintiff on two separate occasions, interrogated her about why she was present in the facility and tried to take her credentials. Plaintiff testified that Caminero wrongfully tried to remove Plaintiff from the facility on two occasions. (Exh. A, Aiken Depo. 148:18-25). Caminero's conduct even caused Plaintiff to have to report to the hospital for further medical treatment.

While Plaintiff sat in the general area waiting to report for her medical visit(s), Defendant Caminero approached Plaintiff and forcefully ordered Plaintiff to leave the premises. (Exh. A, Aiken Depo. 219:2-5). This happened on two separate occasions while Plaintiff was at the facility for medical

reasons. (Exh. CC, memo from A Caminero to R Bruno, date 4/30/2018). Defendant Caminero knew that Plaintiff was an employee who was present for a medical visit but treated Plaintiff as if she "*had no business*" in the West Farm Depot and tried to remove her from her own workplace. (Exh. D, Caminero Depo. 153:15-18). Defendant Caminero confirmed that all employees are allowed to visit all the facilities. But Defendant Caminero still sought-out Plaintiff to harass her about being present at the West Farm depot. (Exh. D, Caminero Depo. 151:13-22). **Defendant Caminero's continued harassive actions against Plaintiff were unreasonable because Caminero knew that there was "*nothing wrong*" with Plaintiff, an employee, being present at West Farm.** (Id. 153:20-25).

Defendant Caminero heard that Plaintiff was in the depot (after she was demoted by Caminero) and went looking for her, specifically to find her. (Exh. D, Caminero Depo. 147:20-148). When he found Plaintiff waiting for her medical visit in various areas of the Depot, he asked her, "*what's your business over here?*" and tried to force Plaintiff to forfeit her MTA credentials (Id. 148:3). As a result of his questioning, Plaintiff rushed out of the Depot to avoid further harassment (Id.). Defendant Caminero did this to Plaintiff in a public area in West Farm, where other employees could have been present to see. (Exh. D, Caminero Depo. 154:22). Even Defendant Murphy heard about the incident(s) and confirmed that Ms. Aiken was "*removed*" from the facility. (Exh. C, Murphy Depo. 245:20 – 246:3). Plaintiff was sickened by Defendant Caminero's continued harassment and was caused to go to the emergency room once again. (Exh. A, Aiken Depo. 219:7-12). After this, Plaintiff applied for Worker's Compensation due to work related injuries. (id.) A few months thereafter, Plaintiff resigned from her employment.

**A reasonable jury could conclude that Caminero, who testified that he was (allegedly) trying to <u>complete his demotion</u> of Plaintiff when he approached her in the above-described humiliating ways and was (allegedly) trying to get Plaintiff's SLD credentials, was unreasonable and part of his hostile/discriminatory demotion process of Plaintiff.**

"The objective hostility of a work environment depends on the totality of the circumstances," viewed from the perspective "of a reasonable person in the plaintiff's position, considering all the circumstances [including] the social context in which particular behavior occurs and is experienced by

its target." Petrosino v. Bell Atl., 385 F.3d 210, 221 (2d Cir. 2004). Here, the jury should be able to examine the totality of Defendant Caminero's conduct to determine whether Plaintiff was subjected to a hostile environment and the degree to which she was subjected to same.

### B. Plaintiff's Claim Regarding Lack of Training Are Relevant To Plaintiff's Discriminatory Demotion Claims and Should Not Be Precluded:

In Point I(B) of Defendants' memorandum, Defendants attempt to preclude evidence related to Plaintiff's demotion. Among other things, Plaintiff intends to testify that she was being denied training and instruction that she sought after Defendant Murphy specifically told Plaintiff's supervisors to "*not train*" Plaintiff. This is relevant to Plaintiff's demotion claims, which are still alive in the case, and also to Plaintiff's hostile work environment claims. When coupled with Defendant Murphy's threatening comments, which the Court determined are relevant to Plaintiff's demotion claims, Defendant Murphy's instructions to Plaintiff's supervisors to refrain from training Plaintiff was done in furtherance of the hostile work environment Plaintiff experienced after her request for religious accommodations. In this regard, MTA/NYCTA will most likely present evidence that Plaintiff (allegedly) performed poorly and that is why she was demoted. To address that defense, Plaintiff will be compelled to tell her story about her constant and continuing requests for (on the job) training, and the way Defendants responded to her requests. The facts relevant to these claims are addressed in the paragraphs below.

Defendant Houston confirmed that "*on the job training*" is required for those promoted to the SLD position. (Exh. B, Houston Dep. 31:15). As per Defendant Caminero, after SLDS are trained in the Zerega facility, the SLDS go into a "*mentor-mentee program based on whatever assigned duties you might be doing*." (Exh. D, Caminero Depo. 18:20-19). "*You pair the new dispatcher with old dispatchers. They work together. The old dispatcher will show the role and duties of that assignment to the new dispatcher*." (Exh. D, Caminero Depo. 23:17-22). If the SLD requires or requests more training, they are routinely paired-up with an SLD with more experience to get that training - on site and on the job. (Exh. D, Caminero Depo. 25:6-25). "***It is up to the employee to come to [management] and let [them] know that you need more help***" (Exh. D, Caminero Depo. 26:10-21), which the facts support that Plaintiff did.

Nevertheless, though customary and afforded to the other newly promoted SLDs, Plaintiff (alone) did not work alongside a senior dispatcher (on the job training) while she was training for the SLD position. (Exh. A, Aiken Depo. 37:15-20). Plaintiff continued to tell Defendants that she was not being trained and no one seemed to want to work with her. Defendants did nothing in response. Plaintiff does not deny that she was told that mistakes were (allegedly) made, but Plaintiff tried to understand what the errors were and sought further training, which were refused and interfered with.

Defendant Caminero knows that SLDS make, and are "*expected to make mistakes for the first couple of months*" (Exh. D, Caminero Depo. 173:2-17) and that is why "*hands on training is important*" so you "*can guide them on the policies as well as the little tips that they should know*." (Id.). Unlike her counterparts, Plaintiff was not paired with any experienced dispatchers and she did not shadow any dispatchers. (Exh. A, Aiken Depo. 60:20). She was "***learning on [her] own. No one was training [her]."*** (Id. 60:23 – 61:5). Plaintiff was given tasks to perform but no one was supervising Plaintiff in the performance of her new tasks. Plaintiff worked independently. (Exh. A, Aiken Depo. 60). Often, Plaintiff had to figure out her duties by herself.

Though Plaintiff would constantly ask her supervisors for guidance, they would ignore Plaintiff's requests. (Id. 25:7-25). Plaintiff attributed her supervisors' refusal to train her to Defendant Murphy's direct instruction to the supervisors to not train Plaintiff.  Plaintiff overheard Defendant Murphy tell the General Support Supervisor to "***not train***" Plaintiff. (Exh. A, Aiken Depo. 33:3-10;  126:14 and 237:25 - 238). Once Defendant Murphy told the supervisor not to train Plaintiff, "*everything went downhill*." Plaintiff "*had to beg for training*." (infra) Defendants "*wanted to make sure [Plaintiff] failed.*" (Exh. A, Aiken Depo. 154:5-13). After that instruction from Defendant Murphy, the supervisors stopped talking to Plaintiff directly. As a result, Plaintiff had to start sending the supervisors emails to communicate her concerns. (Id. 33:3). The supervisors did not respond to Plaintiff's emails either. (Id.). Plaintiff continued to send the supervisors emails because she "***was not being trained***." (Exh. A, Aiken Depo. 34:3-9). Plaintiff tried sending her supervisors emails to get them to communicate with her because she was not being trained. (Id. 34:23-25).

Defendant Murphy is responsible for overseeing training for the SLDS. (Exh. C, Murphy Depo. 146). If this is the case, Defendant Murphy's instruction to Plaintiff's supervisors to not train Plaintiff is a material fact for this trial. If Plaintiff was seeking guidance and equal treatment in her new SLD role, but Murphy prevented Plaintiff from getting training, same is relevant to the overall hostile work environment. According to Defendant Murphy, "***if they come to me saying they need additional training other than what the training they received, then I'll allow them to . . . to get that training***." (Exh. C, Murphy Depo. 89:17). Plaintiff went to Defendant Murphy and indicated she needed more training. (Exh. C, Murphy Depo. 89:24). Specifically, "[*Plaintiff*] *sent* [*Murphy*] *an e-mail saying that she wanted -- she felt like she needed to be more hands on. She wasn't getting it . . .*" (Exh. C, Murphy Depo. 89:19 and 145).

Probationary SLDS, like Ms. Aiken, "*get their training at Zerega and they get an opportunity to get training for that particular position [on-site]. Whatever position they're going to work in, they actually get that training. In that case, that's the crew*". (Exh. C, Murphy Depo. 88:23-89:7). Plaintiff advised Defendants, Houston and Murphy, that she wanted to write a complaint about the fact that she was not being trained properly on the job and about Defendant Murphy telling the supervisor to not train Plaintiff. (Exh. A, Aiken Depo. 126:18). In response, Defendants, Houston and Murphy, called Plaintiff into the office. (Id. 127). Defendants told Plaintiff to write out a complaint about Defendant Murphy's comment – but threatened Plaintiff that there "*would be consequences*" for writing the statement. (Id.) Plaintiff wrote out a complaint (referred to as a "G2") and gave it to Defendant Murphy. Plaintiff testified that Defendants Houston and Murphy then called Plaintiff into an office and began to chastise her about her complaint.

Plaintiff continued to "*ask for intervention" and "nobody heard [her]"* or took any action. (Exh. A, Aiken Depo 170:10-18). As a result, Plaintiff continued to receive retaliatory evaluations and other retaliatory conduct from Defendants until she was wrongfully terminated (Id.). Plaintiff wrote that she "*needed an intervention*." Plaintiff begged the Deputy Manager (Witness John Dhuman) for help because she saw that she was being set up for termination and failure. (Exh. A, Aiken Depo 173:3). No one

responded to Plaintiff's complaints and Plaintiff was demoted thereafter.

As such, as per the above, Plaintiff should be allowed to present evidence about how it came to be that Plaintiff was not being trained for her new position, despite the fact that she was entitled to the training(s) she continued to request. As a direct result of the lack of training, Plaintiff had difficulties on the job and was eventually demoted. Plaintiff's lack of training is directly relevant to her claims of wrongful demotion and hostile work environment. Plaintiff would not use evidence of lack of training to try to prove disparate treatment, but to prove that she was subjected to harsh terms and conditions of employment because she sought religious accommodation. In this regard, as the Court is aware, "adverse employment actions include . . . **the imposition of an 'excessive workload'**." Naumovski v. Norris, 934 F.3d 200, 212, (2d Cir. 2019). Adverse actions also include "**significantly diminished material responsibilities, or other indices. . . unique to a particular situation**." Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006). "Similarly, **'[c]omparatively poor assignments can constitute adverse employment actions**'." Id.

The fact that Plaintiff was not allowed to train in the role she was assigned to but was excessively "cross utilized" and placed in different positions to prevent her from learning her role, is relevant to the hostile work environment. The conduct to which Plaintiff was subjected to, inferior roles, training and responsibilities, as well as and excessive "cross utilization" (which is similar to giving Plaintiff an "excessive workload") is relevant to the totality of the circumstance evincing a hostile work environment. "An adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" Patane v. Clark, 508 F.3d 106, 116 (2d Cir. 2007) (employers failed to assign the plaintiff work in order to induce her to quit her job met this standard for adverse employment action because it would cause someone to "think twice" about engaging in protected activity).

### C.  Corporate Defendants' Complete lack of Investigation, and Facts Related To That Aspect of Plaintiff's Claims, Are Relevant To Support Employer Liability

In Point I(C) of Defendants' memorandum, Defendants seek to preclude Plaintiff from offering

evidence relating to Corporate Defendants' MTA/NYCTA'S failure and outright refusals to investigate and address any of Plaintiff's ongoing complaints about the hostile work environment and about being demoted for discriminatory reasons. Indeed, admissions by MTA/NYCTA EEOC representatives confirm that <u>zero action was taken in response to Plaintiff's ongoing complaints</u>. This is relevant because, in order for the jury to assess liability against Defendant MTA/NYCTA, the jury should assess whether Plaintiff made use of the MTA/NYCTA'S complaint procedures, and placed the MTA/NYCTA on notice of her circumstances.

In addition, to obtain the benefit of the *Faragher/Ellerth* affirmative defense, the MTA/NYCTA must show '**(a)** that [it] exercised reasonable care to prevent and correct promptly any discriminatory behavior, and **(b)** that the [claimant] employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.' <u>Ellerth</u>, 524 U.S. at 765 (emphasis added). Defendants bear the burden of persuasion on both elements, but, with respect to the second one, if Defendants can demonstrate that the Plaintiff 'has completely failed to avail [herself] of the complaint procedure, the burden of production shifts to the employee to come forward with one or more reasons why the employee did not make use of the procedures.

**Plaintiff's NYSHRL Claims:**

Under the NYSHRL, an employer would be liable for the conduct of their employee's discriminatory conduct, if the employer "became a party to it by encouraging, condoning, or approving it." <u>Gorman v. Covidien</u>, LLC, 146 F. Supp. 3d 509, 521 (S.D.N.Y. 2015).

**Plaintiff's NYCHRL Claims:**

Under the NYCHRL, employers are strictly liable for unlawful harassment by a supervisor or manager, **regardless of whether it culminated in a tangible employment action**. As the New York Court of Appeals held, "[t]he plain language of § 8-107 . . . creates vicarious liability for the acts of managerial and supervisory employees even where the employer has exercised reasonable care to prevent and correct any discriminatory actions and even where the aggrieved employee unreasonably has failed to take advantage of employer-offered corrective opportunities." <u>Zakrzewska v. New School</u>, 14 N.Y.3d 469, 478, 928 N.E.2d 1035, 1038, 902 N.Y.S.2d 838, 841 (2010).

**Applicable Facts Relevant to Defendant MTA/NYCTA'S Failure To Investigate:**

Here, the jury should know about multiple attempts that Plaintiff made to utilize the MTA'S complaint procedure and the MTA'S utter refusal to address any of Plaintiff's concerns – both before and after Plaintiff was demoted. The facts in support of this claim are described below.

Defendant NYCTA has an EEO Policy and Complaint Procedure. (SJM Exhibit F, Internal discrimination Complaint Procedure). On or about July 12, 2017, many months before Plaintiff was demoted, Plaintiff made her first complaint to John Dhuman, Deputy General Manager. (SJM Exhs. M and U). Despite Plaintiff's complaint about "retaliation," and MTA/NYCTA'S policies which required immediate action, Mr. Dhuman did not forward Plaintiff's complaint to the EEO until July 28, 2017. (Exh U).

By August 2017, Plaintiff's Complaint was received by to EEO and nothing was done. (See SJM Exh. Z). On August 1, 2017, Mr. Dhuman sent Labor Relations notice that an investigation should be done into Plaintiff's claims of harassment and retaliation. NYCTA Defendants merely looked at the email and determined that it would not look further into Plaintiff's complaint. (Exh. E, Seda Depo. 184:16-20).  In this email, Plaintiff claimed "retaliation" as well. EEO was aware of it and took no action to investigate it. (SJM Exh. E, Seda Depo. 186:6). Also, before Plaintiff was demoted/terminated, Plaintiff made another complaint to "Affirmative Action" at NYCTA. (SJM Exh Q., Complaint to Affirmative Action Office). This complaint to "Affirmative Action" went unanswered.

On January 19, 2018, after Plaintiff was demoted but while still an MTA/NYCT employee and still in the role of a dispatcher, Plaintiff submitted a written complaint to NYCTA'S EEO Department. (SJM, Exh. P, EEO Complaint by G. Aiken, dated 1/19/2018).

As per the NYCTA EEO policies, an investigation into EEO complaints are supposed to be conducted within 120 days. (Exh. E, Seda Depo. 204:17 - 205:3; Exh. F, Complaint Procedure  ¶6.6). Plaintiff made a written complaint on January 15, 2018, and then followed up at NYCTA'S EEO the very next day on January 16, 2018 when she "walked in" to the EEO office to discuss the same complaint. (Exh. E, Seda Depo. 98; see also, Exh. X, p. 2, email from G. Aiken dated 1/15/2018). Plaintiff was

interviewed on January 16, 2018, and then Plaintiff came in again to speak to the EEO investigators on January 19, 2018. (Exh. E, Seda Depo. 99-100:12-16).

NYCTA was aware of Plaintiff's complaints and <u>delegated the investigation to three investigators to handle, Antonio Seda, Alexander Linzer, and Jacob Goins</u>. (Exh. E, Seda Depo. 43:18-25). Another individual named "Amber Lewis" was also involved in the process (Id. 109:10-9 and 134:7). No less than four people were involved in the complaint of Ms. Aiken – all at the same time. Further, the EEO Office was "***close to full staffing at the time period***." (Exh. E, Seda Depo. 132:17-22).

"*There were no interviews done of the people [Plaintiff] complained about*" by anyone in Defendants' EEO Department. (Exh. E, Seda Depo. 105). As per the EEO Director, "***There's no indication that anybody reached out to them from EEO and advised them of these complaints***." (Id. 135:18-136:6). The EEO Director does not even know if anyone ever tried to find out if any of the Defendants ever knew that Plaintiff sought a religious accommodation. (Exh. E, Seda Depo. 136:16). Defendants' EEO Director, who was directly involved in overseeing the investigation, cannot say what actions (if any) were taken by the other three investigators assigned to the case. (Exh. E, Seda Depo. 122:21-24). The EEO Director Seda, cannot say if anyone looked into the histories of the Individual Defendants to see if they had any prior discrimination complaints against them. (Exh. E, Seda Depo. 124:12). **The EEO Director did not even read Plaintiff's written complaint** (dated 1/16/2018) **and cannot say that he ever read same prior to his deposition in 2020** (Exh. E, Seda Depo. 127:5 – 129:6) **The EEO Director did not even know that Plaintiff alleged religious discrimination or named Defendants Murphy, Houston and Caminero, therein**. (Id.). The EEO Director confirms that no one from Defendants' EEO Department attempted to speak to Defendant Houston about Plaintiff's complaint. (Exh. E, Seda Depo. 130:23 – 131:5).

Defendant Houston was unaware that Plaintiff ever made a complaint to the NYCTA that he subjected Plaintiff to religious discrimination. (Exh. B, Houston Dep. 78:15-25). According to Defendant Houston, he was never advised that any employee ever complained about him as it related to religious discrimination or religious accommodation requests. (Id.). The first time Defendant Houston was advised

of Plaintiff's discrimination complaints or concerns and allegations was after he retired and after the Defendant NYCTA was sued in this litigation. (Exh. B, Houston Dep. 80). Defendant Houston was unaware that Plaintiff had any problems at all regarding her requests for religious accommodation before this litigation. (Id. 80-81:4).

Defendant NYCTA does have an EEO Office, an EEO Officer, and Human Resources or Labor Relations Office. No one from Defendant NYCTA ever contacted or advised Defendant Houston about Plaintiff's complaints/concerns about him or Defendant Murphy. (Exh. B, Houston Dep. 82 – 83:12 and 100:13-101:13 and 134:19 – 135:1 - 137). Defendant Houston did not know if Plaintiff ever raised any concerns about her religious accommodation requests as it relates to Defendants, Murphy or Caminero. (Exh. B, Houston Dep. 102-103). Defendant Houston was unaware that Plaintiff ever alleged that she was not being allowed to observe the Sabbath. (Exh. B, Houston Dep. 109). No one from NYCTA ever contacted Defendant Houston to discuss Plaintiff's job performance as a SLD. (Exh. B, Houston Dep. 82:24 – 83:2). Defendant Houston was not aware that Plaintiff filed a Charge of Discrimination with the Federal EEOC wherein his actions were at issue. (Exh. B, Houston Dep. 90:10-25).

John Dhuman, who was Defendant Houston's direct supervisor, and who Plaintiff sent a complaint to regarding "retaliation" by Defendants Houston and Murphy (Exh. M, email from G. Aiken to J. Dhuman, dated 7/21/17), never spoke to Defendant Houston about the complaint made by Plaintiff. (Exh. B, Houston Dep. 183:13-25). Mr. Dhuman sent Plaintiff's complaint to the EEO Department seeking "guidance" because of the claims of retaliation made by Plaintiff. (Exh. U, emails from J Dhuman to EEO, Re: Evaluations on a fair chance). But, without speaking to Plaintiff, or getting any details concerning the retaliation that Plaintiff alleged, the EEO summarily determined that they would not investigate Plaintiff's 7/12/2018 complaint (Exh. U).

Mr. Dhuman and Defendant Murphy met for daily managerial meetings every single day. (Exh. C, Murphy Depo. 157). But, Mr. Dhuman never mentioned or spoke to Defendant Murphy about Plaintiff's retaliation complaint either. (Exh. C, Murphy Depo. 158:4 and 154-155). Indeed, during her deposition, Defendant Murphy was surprised to see this complaint by Ms. Aiken to Mr. Dhuman. (Id.).

Despite Plaintiff's complaints, Defendant Murphy has "***never been subject of any investigation by the MTA regarding violations of the EEO policy***." (Exh. C, Murphy Depo. 49:18).

Defendants' EEO Director confirms that "there's no indication in the file that [Defendant] Murphy was interviewed by a member of the EEO staff in connection with these allegations." (Exh. E, Seda Depo. 129:16) and "there is no indication in the file that [the EEO investigators and staff] ever asked Defendant Murphy for a statement" in response to Plaintiff's complaint. (Id. 129:19). The first time that Defendant Murphy ever learned that Ms. Aiken made religious discrimination complaints against Defendant Murphy was days before Defendant Murphy was deposed in this federal case – in the year 2020 (Exh. C, Murphy Depo. 50:12-21 and 52). Defendant Murphy was not aware that Plaintiff made any complaint about her at any time while the events where occurring at West Farm Depot. Indeed, Defendant Murphy found out about Plaintiff allegations well after Plaintiff stopped working at NYCTA and after Defendant Murphy transferred to another facility. (Exh. C, Murphy Depo. 51 – 52 and 59). Defendant Murphy was never contacted by anyone in Defendants' EEO Department about any of the claims made by Ms. Aiken. (Exh. C, Murphy Depo. 53-54). Defendant Murphy had no idea that Plaintiff complained about her conduct – at all – until the year 2020, before Defendant Murphy was deposed. (Exh. C, Murphy Depo. 54). Defendant Murphy has no clue if NYCTA'S EEO investigated any allegations concerning Plaintiff and her interactions with Defendant Murphy while at West Farm Depot. (Exh. C, Murphy Depo. 57-58). Defendant Murphy did not know that Plaintiff made a complaint to the EEOC either. (Exh. C, Murphy Depo. 56).

Defendant Caminero was never interviewed by the EEO department in relation to Plaintiff's complaints. (Exh. E, Seda Depo. 137:7-15). Defendant Caminero did not know what allegations Plaintiff was making until he was called for his deposition in this case. (Exh. D, Caminero Depo. 78 - 81). He was not contacted by NYCTA'S EEO department and did not know that Plaintiff made any claims, anywhere, until after this lawsuit commenced. (Id. 89:20 – 90 and 94-95). Defendant Caminero knew nothing about Plaintiff filing claims in the EEOC prior to this lawsuit. (Exh. D, Caminero Depo. 93). **Defendant Caminero did not even know that Ms. Aiken wrote a complaint about him, claiming**

**that he caused her to faint and be taken to the hospital during the termination meeting**. (Exh. D, Caminero Depo. 140:25-141). Defendant Caminero does not know if the NYCTA investigated that incident or Ms. Aiken's complaint. (Exh. D, Caminero Depo. 141:21 – 142, 146-147).

Ms. Aiken provided the MTA/NYCTA with names (and phone numbers) of witnesses to interview concerning her discrimination claims. None of the people (witnesses or perpetrators) mentioned by Plaintiff in her complaint were interviewed by NYCTA'S EEO, nor did the EEO attempt to get a statement from any of them. (Exh. E, Seda Depo. 129:24; 130:4; 129:23; 135:9-17; 137:20; see also, Exh. T, Letter from G. Aiken to J. Goins re: list of witnesses). As per the EEO Director Mr. Seda, "***there is no indication in the file that those individuals were contacted***." (Id. 140:25 - 141). There was nothing stopping or preventing the EEO investigators from reaching out to or speaking to the <u>seven witnesses</u> Plaintiff identified (Exh. E, Seda Depo. 155:3-9) "***This [investigation] was open for a number of months and [Seda's] assumption is that time could have been created to speak to somebody here***." (Exh. E, Seda Depo. 156:2-8).  The investigation was pending for over 8 months and no action was taken to investigate Plaintiff's claims. (Exh. E, Seda Depo. 156). Over 200 days passed and the EEO made no determination about any aspect of Plaintiff's claims before Plaintiff resigned. (Id. 158).

In this Case, the jury must be allowed to determine whether the Defendant MTA/NYCTA'S outright failures to address Plaintiff's ongoing complaints contributed to the ongoing hostile environment she faced and whether the MTA/NYCTA should be liable for failing/refusing to act in response to known complaints by Plaintiff. MTA/NYCTA'S failure to investigate and remedy the hostile work environment is relevant for this trial. The exhibits identified by Defendants' in Point I(C) of their memorandum directly relates to this issue and are relevant. These documents prove that: **[1]** Defendants had clear notice; **[2]** that Plaintiff utilized MTA/NYCTA'S complaint procedures on multiple occasions; **[3]** that Defendants had opportunity to correct and prevent the discriminatory conduct against Plaintiff; **[4]** that Defendants took no action to prevent/control the hostile environment against Plaintiff; and **[5]** that Defendants did not take their policies seriously, to the detriment of Plaintiff, and allowed the abuse of Plaintiff to continue unabated.

**D.   Plaintiff's Demotion Is Not the Only Adverse Employment Action at Issue Because A Hostile Work Environment By A Supervisor Is Also An Adverse Employment Action**

In Point I(D) of their memorandum, Defendants argue that the only adverse employment action that Plaintiff should be able to present to the jury is her demotion. Plaintiff already agreed that Plaintiff is not presenting evidence of a constructive discharge. However, other circumstances to which Plaintiff was subjected, such as being overly "cross utilized," and spread thin through different assignments are adverse employment actions that should be explained to the jury.

Adverse employment actions are not defined "solely in terms of job termination or reduced wages and benefits." Arena v. Agip USA Inc., 2000 U.S. Dist. LEXIS 2578, at *18-19 (S.D.N.Y. 2000). "Less flagrant reprisals by employers may constitute an adverse employment action." (Id.) "Courts have found that diminution of job responsibilities, **inferior and less desirable work duties and deprivation of prerequisites** all constitute adverse employment actions." Arena, *Supra*. "A hostile work environment can constitute an adverse employment action for the purposes of establishing a prima facie case of employment discrimination under Title VII." Singh v. N.Y.C. Off-Track Betting Corp., 2005 U.S. Dist. LEXIS 11098, at *34-35 (S.D.N.Y. 2005), *citing,* Morgan, 536 U.S. at 115-16; Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 446 (2d Cir. 1999).

**Plaintiff 's NYCHRL Claims:**

Under the NYCHRL, New York State courts have declined to utilize the federal "severe or pervasive" standard for NYCHRL claims and instead adopted "a rule by which liability is normally determined simply by the existence of differential treatment." Williams v. New York City Hous. Auth., 872 N.Y.S.2d 27, 38 (N.Y. App. Div. 2009). This has been interpreted to mean that in order to establish a discrimination claim under the NYCHRL, the Plaintiff need only demonstrate by a preponderance of the evidence that she has been treated less well than other employees because of her request for religious accommodations. *See* Williams, 872 N.Y.S.2d at 39. Under this standard, the conduct's severity and/or pervasiveness are relevant only to the issue of damages. *See* Williams, 872 N.Y.S.2d at 38. And, to prevail on liability, the Plaintiff need only show differential treatment —i.e., that she is treated "less

well"— because of a discriminatory intent. Id. at 39. *Furthermore, the challenged conduct need not even be "'tangible' (like hiring or firing)." Id. at 40*. When the issue of a discriminatory comment or conduct is at issue, the employer will only prevail on summary judgment if it is able to show that the alleged conduct amounted a petty slight or trivial inconvenience. Id. at 41.

In this Case, evidence of the manner in which Plaintiff was treated following her complaints and request(s) for accommodations, to cause her to be unable to be properly trained and then demoted, should be reviewed by the jury. Among other things, Plaintiff testified that she was "cross utilized . . . more than others," which means that Plaintiff was made to work in different posts every single day, despite the fact that her position was an "indoor" dispatcher. Plaintiff was made to work out in the yard, out on the streets in the field and was made to perform many other tasks that were inconsistent with her "pick" or position, after she complained and sought religious accommodations. These facts of adverse employment actions against Plaintiff are relevant to Plaintiff's demotion and hostile work environment claims.

### E.   Defendants' List of Exhibits Under Point E. Of Their Memorandum, Which They Assert Should Be excluded, Are Relevant

In Point I(E) of their memorandum Defendants point to several items that Plaintiff placed in the Joint Pretrial Order and argue that same should be excluded. However, besides just listing off exhibits all throughout their memo, **without explaining to the court why *each* of these documents are not relevant**, Defendants attempt to cause the Court to just blanketly exclude evidence without analysis or reason. Indeed, Defendants' short-cited charts, with minimal argument as to why these documents are irrelevant, does not satisfy their burden in their motion *in Limine*. Defendants' multiple lists of documents should be rejected for this reason alone. Nevertheless, Plaintiff will address the exhibit from Defendants list in Point I(E) that Plaintiff intends to use at trial.

#### Plaintiff's Exhibit 3, "Aiken's Cash Out Sick Days Memo:"

Plaintiff described that she was being told to use her vacation and sick days to observe her religious sabbath, which was against the policies of the MTA/NYCTA. Plaintiff asserts that, as part of the hostile work environment against Plaintiff, Defendant Murphy tried to convince Plaintiff to cash out

her sick days so that Plaintiff would be penalized if she needed to use them for her religious observance. Plaintiff regarded this conduct as part of Murphy's harassment in retaliation for Plaintiff's seeking a religious accommodation and for Plaintiff's absence on Sundays.

**Plaintiff's Exhibit 34, "Email Re: Authorized Personnel:"**

On or about 10/6/2017, Plaintiff was written up for allegedly refusing access to copy machine. This was one of the alleged write ups that were secreted into Plaintiff's personnel file without her knowledge and was used to (later) support her demotion from the SLD position. Undoubtedly, Defendant MTA/NYTA will use the allegation that Plaintiff was demoted, in part, due to this incident. In this Exhibit, Plaintiff's 34, Plaintiff addresses the incident and explains what occurred on the day of the incident. As such, this exhibit is directly related to Defendants' claims that plaintiff was demoted for poor performance and is being used to rebut the reasonableness of Defendants' claim. After Plaintiff submitted this memo regarding the incident, Plaintiff did not hear about the incident again until she saw that she was (secretly and unfairly) written up for same months later.

**Plaintiff's Exhibit 53, "Aiken's FEMA Certificates:"**

Certificates used to support the element of the claim(s) that plaintiff was "*qualified*" for her SLD position and had the requisite credentials for the promotion.

**Plaintiff's Exhibit 84, "Email Re: No Knowledge of U/A on My Record:**

As the Court is aware, two of the things that Defendants demoted Plaintiff for were for an alleged "unauthorized absence" and "attendance" issues. But, Plaintiff had perfect attendance, but for the days she called in sick due to a hospitalization, which was "excused." The other attendance incident that Plaintiff was disciplined/demoted for was for an alleged unauthorized absence. This is a memo that Plaintiff wrote regarding the authorized and approved absence that was secretly marked as "unauthorized" and unknowingly placed in Plaintiff's personnel file. Defendants then used the (secret) unauthorized absence as a reason to demote Plaintiff months later. However, this Exhibit shows that Plaintiff learned about the secret write up, tried to address it, and tried to have Defendants correct same. It demonstrates and is relevant to prove that Defendants' reasons for demoting Plaintiff based on

"attendance" was unreasonable and pretextual – which is one of Plaintiff's burdens at trial.

**Plaintiff's Exhibit 91, "Emails Re: Evaluations on a Fair Chance:"**

These emails are important and relevant to the claims made by Plaintiff that she complained to the Depot's General Manager John Dhuman about retaliation by Defendants Houston and Murphy many months before her demotion. Plaintiff also complained about not getting a fair chance and not being allowed to receive adequate training. Mr. Dhuman did not address Plaintiff's concerns, but he did send Plaintiff's complaint to MTA/NYCTA'S EEO department and advised them that he believed Plaintiff's complaint should be investigated by them. This Exhibit demonstrates that in response, Defendant MTA/NYCTA'S EEO department sat on Plaintiff's complaint for weeks and then rejected it outright without speaking to Plaintiff, Defendant Houston or Defendant Murphy. After the EEOC declined to address Plaintiff's complaint, Mr. Dhuman did not follow up with Plaintiff or try to resolve her complaint and took no further action. Mr. Dhuman certainly did not discuss the complaint with Defendant Murphy, whom he met with every single week. As a result, the hostile retaliatory work environment against Plaintiff continued unaddressed until she was (wrongfully) demoted.

**F.  Defendants' Attempt to Prevent Plaintiff from Proving Her Discrimination Claims, Which Survived Defendants' Motion for Summary Judgment, Should Be Denied**

At Point I(F), Defendants argue that Plaintiff should be precluded from presenting documentary or testimonial proof relating to her request for religious accommodations. How in the world can the Defendants be asking this Court to preclude any and all documentation related to Plaintiff's religious accommodations request in a religious accommodations case? Why conduct a trial at all? Plaintiff's entire claim centers around the fact that she made religious accommodations requests and faced direct hostile work environment for same.

Defendants want this evidence precluded because it would demonstrate, unequivocally, that Plaintiff made numerous requests for religious accommodations and Defendants were recalcitrant to her requests, ignored her requests for many months, indicated that plaintiff was "***playing games***" when she made her request, and ignored (as opposed to denied) Plaintiff's request for over 8 months. Then, When

Plaintiff was granted the accommodation, the accommodation was intentionally kept from Plaintiff and hidden by Defendant Caminero. Then, Plaintiff was terminated for "*attendance*." When the evidence is reviewed, the evidence will prove that plaintiff had no "attendance" issues. Thus, a reasonable jury could conclude that Plaintiff was demoted for exercising her religious accommodation on Sundays.

Evidence of the manner in which Plaintiff's religious accommodations were handled and viewed by the MTA/NYCTA is relevant and supports Plaintiff's claims of a hostile environment because it demonstrates a general practice and policy by the MTA/NYCTA to ignore its religious accommodation policies, and the fact that plaintiff complained about religious accommodation discrimination were not taken seriously. When Plaintiff complained about religious accommodation discrimination at the MTA, her complaints were ignored, just like her requests for the accommodation, because Defendant MTA/NYCTA treated same as a nuisance.

### Plaintiff Is Entitled To Call And Present Testimonies Of The Individuals That Defendants Seek To Preclude

At Point II of their memorandum, Defendants seek to preclude witnesses from testifying at trial, though many of the witnesses identified by Defendants lend direct evidence to plaintiff's hostile work environment claims, the fact that Plaintiff repeatedly complained about same, the fact that Plaintiff's multiple complaints were ignored, and the fact that Individual Defendants were allowed to abuse Plaintiff with impunity. As Plaintiff does not intend to call every witness identified by Defendants in their list on pages 15-16 of their memorandum, Plaintiff will address the witnesses Plaintiff does intend to call.

#### Regarding John Dhuman:

Witness Dhuman is a Deputy General manager in the Depot (West Farms) wherein Plaintiff worked. On July 12, 2017, six months before Plaintiff was demoted from her SLD position, Plaintiff wrote a complaint to Witness Dhuman indicating that she was being "retaliated" against and describing the abusive conducts of Defendants Huston and Murphy. In response, Mr. Dhuman sent Plaintiff's complain to MYA/NYCTA'S EEO department for review. The EEO declined to investigate Plaintiff's complaint and gave it back to Mr. Dhuman to resolve. Mr. Dhuman ignored the complaint to did nothing

in response – not even ask Plaintiff the status of the complaint. As a result, Defendants were allowed to continue to abuse Plaintiff with impunity.

Mr. Dhuman is a material witness relative to plaintiff's claims of hostile work environment and Defendants refusal to act in the response to a complaint of retaliation by Plaintiff. Again, demonstrating the MTA/NYCTA'S failure to act in response to a complaint made by Plaintiff is relevant to liability against the employer, MTA/NYCTA.

**Regarding Witnesses Antonio Seda, Jacob Goins, or Alexander Linzer:**

Witness Seda, Goins and Linzer were all high ranking members of MTA/NYCTA'S EEO department, who received Plaintiff's complaint of discrimination and harassment, including the names of witnesses, and took no action in response thereto. As such, these Witnesses are relevant to establish liability on the employer MTA/NYCTA for failing to address Plaintiff's multiple complaints.

These witnesses also supports Plaintiff's claims for damages because, when the EEO interviewed Plaintiff about her complaints after her demotion, the EEO recognized that Plaintiff claimed to be experiencing mental/emotional issues that caused the EEO to send Plaintiff to the Medical unit to assess Plaintiff's mental state. There, Plaintiff was being evaluated and monitored for psychological issues associated with her mistreatment by Individual Defendants. The fact that the EEO referred Plaintiff to the hospital and for medical evaluation is material.

Plaintiff already advise the Court that these witnesses' testimonies may be largely cumulative and Plaintiff may not need to call all three. Plaintiff was discussing which of the three would be produced by Defendants for trial and included all three in the Joint Pretrial Order incase any one was unavailable.

**Regarding Witness Danielle Brogdan:**

Witness Daniel Brogdan was the Director of Collective Bargaining and worked in Labor relations. Witness Brogdan was the person that received Plaintiff's request for reasonable accommodations and approved same, with specific instructions to Defendants about how to treat Plaintiff's accommodations. Defendant Caminero received the approval from Witness Brogdan, did not inform Plaintiff of her accommodations, and prevented Plaintiff from knowing that she was approved.

The need for this witness to appear to testify may be obviated by the testimony of Defendant Caminero.

**Regarding Witness John McGahern:**

Witness McGahern was the General Superintendent at West Farms Depot, who received complaints of harassment and not being afforded a fair chance by Plaintiff and took no action in response to same. Mr. McGahern is relevant as he supports that there existed a pattern or practice by Employer MTA/NYCTA in ignoring Plaintiff's complaints. Evidence also exist that unequivocally demonstrates that Mr. McGahern was aware of Plaintiff's religious accommodations requests, tried to stymie Plaintiff's religious accommodations, referred to Plaintiff's religious accommodations request as Plaintiff "*playing games*," and never approved her request.

## CONCLUSION

For the foregoing reasons, Defendant's motion *in Limine* should be denied in its entirety.

Date:   New York, New York
        May 17, 2023

                                        Respectfully Submitted,

                                        _____
                                        Gregory Calliste, Jr., Esq.
                                        Alexandria Jean Pierre, Esq.
                                        *Attorneys for Plaintiff*
                                        PHILLIPS & ASSOCIATES, PLLC
                                        45 Broadway, Suite 430
                                        New York, New York 10006
                                        (212) 248 – 7431 (phone)
                                        gcalliste@tpglaws.com
                                        yhiraman@tpglaws.com